IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GABRIEL J. MCALISTER,

               Petitioner,

    vs.

RICK HILL, Warden, Folsom State Prison,[1]

               Respondent.

No. 2:18-cv-01930-JKS

MEMORANDUM DECISION

Gabriel J. McAlister, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. McAlister is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Folsom State Prison. Respondent has answered, and McAlister has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On September 30, 2014, McAlister, along with co-defendant Marcus A. Logan, was charged with the murder of Timothy Schweiss (Count I) and attempted second-degree robbery (Count II). The prosecution's theory was that Logan, McAlister, and another man, Marlyn Steward, lured Schweiss into an apartment complex to rob him and, during commission of that robbery, McAlister pulled out a handgun and shot Schweiss in the abdomen. With respect to the murder count, the amended information alleged as a special circumstance that the murder was committed while the defendants were engaged in the commission of an attempted robbery. The information further alleged as to both counts that McAlister intentionally and personally discharged a firearm proximately causing a death. Both men entered pleas of not guilty, denied

---

[1] Rick Hill, Warden, Folsom State Prison, is substituted for Tammy Foss, former Acting Warden, Salinas Valley State Prison. Fed. R. Civ. P. 25(c).

the allegations, and proceeded to a jury trial.  On direct appeal of his conviction, the California

Court of Appeal recounted the following facts underlying the charges against McAlister and the

evidence presented at trial:

### The Murder

Schweiss was murdered in the parking lot of the Somerset Apartments in the Arden–Arcade area of Sacramento on August 21, 2012.  That night, defendants Logan and McAlister and codefendant Stewart were hanging out at the complex.  McAlister had spent the previous night in an upstairs apartment (apartment 26) toward the back of the complex.  The apartment was leased to one of his friends, Robert Jordan.  Jordan was living elsewhere with a girlfriend at the time, but stopped by his apartment the night of the murder to pick up some clothes and was still in the complex when the murder occurred.  At some point, McAlister's girlfriend, Ashley Johnson, also came over to apartment 26.  Several people lived in the apartment directly below Jordan's apartment (apartment 25), including Amanda Ford.  Logan came over to that apartment sometime during the evening and also hung out in front of both apartments with a group of people, including McAlister and Stewart.  Members of the group were drinking alcohol and playing dominos.

At about 10:30 p.m., McAlister left the complex and walked across the street with Logan to sell cocaine to someone who had contacted Johnson about making a purchase. When the two returned a short time later, Reginald Dunn was waiting in his car to be let through the gate to the parking lot.  Dunn was not associated with anyone involved in this case, but had seen McAlister and Logan around the complex.  As the gate opened, McAlister asked Dunn to drive him and Logan to the back of the complex.  Dunn agreed. McAlister got into the front passenger seat, removing a handgun from his waistband and placing it in his lap as he sat down.  Logan got into the back seat.  Dunn then drove to the back of the complex and parked.  McAlister and Logan got out and walked back to the group.

A few minutes later, at about 10:40 p.m., Angel Tewksbury came out of her apartment that was across from apartment 26.  As she walked towards the parking lot, Stewart asked her to give someone directions to the complex and handed her a cell phone.  Tewksbury complied, acknowledging during her testimony at trial she believed Stewart was setting up a marijuana sale.[FN3]  The person on the other end of the line was Schweiss.  He was known to sell marijuana in the area.  Tewksbury continued her walk to the parking lot while talking to him on the phone. Stewart, McAlister, Logan, and another man joined.  Schweiss said he was at the mini mart across the street in a blue van and told Tewksbury to have Stewart come to him.  Stewart, however, had walked over to the complex's laundry room.  So Tewksbury told Schweiss: "Come in the apartments.  He's not here.  But he's in the apartments."  Schweiss agreed, drove across the street, and pulled into the parking lot.  As he parked, Tewksbury walked over to Stewart and returned the phone.  McAlister asked where Schweiss was.  Tewksbury answered, "right

there in the car, the blue van."  She then walked back to her apartment, where she heard two gunshots a couple minutes later.

> FN3.   Initially charged with murder along with McAlister, Logan, and Stewart, Tewksbury pleaded guilty to aiding and abetting in the sale of marijuana in exchange for her testimony.

Nikiya Burnett pulled into the parking lot during these intervening minutes.  She initially thought "a fight or something was going on."  As she described: "There was a big white guy standing behind a car or between two cars and there was some black guys facing him on the opposite sides of the car."  She continued: "The white guy was saying leave me alone. He was saying, 'Help.  Somebody help.  I don't have anything.  I gave you everything.  Leave me alone.  Help.  Help.'"  Burnett parked her car while the confrontation was still going on and went into her apartment, where she also heard two gunshots.  While Burnett could not identify any of the men involved in the confrontation, she did notice one of the men had his hair in dreads, which is how Logan wore his hair. Brianna Menna witnessed both the confrontation and the shooting.  While she did not testify at trial, her call to 911 was played for the jury.  During the call, she reported: "They shot him.  I think he [was] hit once or twice?  He was hit once in his lower abdomen."  She also reported, "they were robbing him" and "ran off" after the shooting. Both Menna and Burnett, who came out of her apartment after the shots were fired and also called 911, comforted Schweiss as he lay bleeding in the parking lot.

As previously mentioned, Jordan was also in the complex when Schweiss was shot.  Hearing a "boom," Jordan turned to run in the opposite direction, but slipped and fell to the ground.  He then got up and walked toward his brother's apartment, near apartment 26.  As he did so, a number of people walked past him from the direction of the parking lot.  McAlister was one of these people.  Jordan asked McAlister what happened. McAlister responded: "We ain't playing."  When Jordan asked what that meant, McAlister said: "I downed him."  Jordan could see McAlister was armed with a handgun. However, despite being familiar with firearms, Jordan had "never seen one like that."  A few seconds later, Logan also walked past Jordan from the same direction.

A couple minutes after the shooting, McAlister and Logan entered apartment 25. As mentioned, Ford lived in this apartment.  She was playing dominos with the group outside when she heard the gunshots and quickly retreated into the apartment.  Several people were already inside the apartment when McAlister and Logan arrived.  Ford testified Logan sat quietly by himself in the living room with his head down while McAlister and another man, who went by the nickname "June," talked in the kitchen. McAlister was laughing about the shooting.  He said he got "two zips of weed" and then, as he put it, "I turned around and was like pop, pop," using his hand to imitate firing a gun.  According to Ford, McAlister "thought the whole thing was funny" and "had no remorse whatsoever for what happened."  McAlister returned to apartment 26 about 15 minutes later; Logan spent the night in apartment 25.  At some point that night, Logan also told Ford: "I'm gonna kill [McAlister] because he just killed that man for no reason," and "[McAlister] turned around and just shot him for no reason."

In the meantime, police and emergency medical personnel arrived at the complex.[FN4]  Schweiss was transported to the hospital, where he was pronounced dead. The cause of death was a single gunshot wound to the abdomen.  The bullet traveled through the stomach and pancreas, damaged the aorta and other smaller blood vessels, and also caused a fracture to the spinal column, before lodging in the muscles of the back.

> FN4.   While Stewart is not an appellant in this case, we note he was in front of a different apartment complex across the street with Lasharita Mercado when emergency personnel arrived.  Mercado placed a small amount of marijuana wrapped in cellophane between her breasts.  Mercado knew Stewart to sell marijuana, having bought some from him about 10 minutes before the shooting.  She had also seen Schweiss in the area selling marijuana.

## Police Investigation

Homicide detectives arrived at the crime scene early the next morning.  A live round of 7.62x39mm ammunition was found on the ground one parking space away from where Schweiss's van was parked.  An expended cartridge of the same caliber and brand was found a short distance away, across the parking lot from the van.  The van's passenger side sliding door was struck by the round that did not hit Schweiss. That bullet's jacket was recovered from inside the door panel.  A comparison of the expended cartridge found in the parking lot with both the jacket recovered from the door panel and that recovered from Schweiss's back indicated both could have been fired from the same gun and were likely the same caliber as the expended cartridge.  Inside the van was a duffel bag that had the strong odor of marijuana.  Particles of the plant were found inside, but not a sellable amount.  Also in the van, at the bottom of a trash can, was Schweiss's wallet containing around $100.  The van further contained an expended simunition cartridge, non-lethal ammunition used by law enforcement agencies for training purposes. Part of a simunition round was also found on the ground near the van.

Further investigation, including review of video recorded by various surveillance cameras located around the apartment complex, indicated to detectives that persons of interest may be in apartments 25 and 26.  These apartments were cleared by a SWAT unit after sunrise. McAlister and Johnson emerged from apartment 26.  Logan, Ford, and several others, including seven children, emerged from apartment 25.  Before exiting the latter apartment, Ford helped Logan cut off his dreads.

A subsequent search of apartment 26 uncovered a half-full box of ammunition of the same caliber and brand as the live round and expended cartridge recovered from the parking lot.  The box was hidden inside the bottom of a chair.[FN5]  This particular type of ammunition is relatively rare in the United States, originating from the Soviet Union, and is fired by various Eastern Bloc submachine guns and service pistols, which would explain why Jordan had never seen a gun like the one McAlister was carrying immediately following the murder.  Nothing of evidentiary value was found in apartment 25.  However, Ford testified she found a bag containing the dreads she helped Logan

remove and a bag of ammunition rounds in the apartment sometime after the police conducted their search. She drove the items to another part of Sacramento and threw them in a creek.

> FN5.   Also in a chair, beneath the cushion, was a loaded .45 caliber handgun. However, this gun could not have fired the cartridge recovered from the parking lot.

The gun used to murder Schweiss was not recovered. Nor were the "two zips of weed" McAlister admitted taking from him. Logan also admitted during his police interview that was played for the jury during the prosecution's rebuttal case, he was present during the robbery. He acknowledged, "people wanted free weed" and "somebody" pulled a gun and demanded the product before Schweiss was killed.[FN6]

> FN6.   Logan and McAlister each presented a defense case. McAlister testified during his defense case. The prosecution then presented a case in rebuttal that included Logan's statement to police. We describe Logan's statement and McAlister's testimony in greater detail in the discussion portion of this opinion. Where relevant, other evidence presented during these portions of the trial will also be described in the discussion.

*People v. Logan*, No. C078017, 2017 WL 2224351, at *2-4 (Cal. Ct. App. May 22, 2017).

At the conclusion of trial, the jury found McAlister guilty of first degree murder (Count I) but was unable to reach verdicts on Count II and all of the special circumstance and enhancement allegations, so the court declared a mistrial as to those charges.[2] The trial court subsequently sentenced McAlister to an indeterminate term of 25 years to life imprisonment.[3]

Through counsel, McAlister appealed his conviction, arguing that: 1) there was insufficient evidence to support the first-degree murder conviction; 2) his constitutional rights were violated by the admission of a) Logan's police interview statements implicating McAlister, b) Ford's testimony about statements Logan made after the incident, c) various firearms,

---

[2]      The jury found Logan not guilty of first-degree murder but found him guilty of the lesser-included offense of second-degree murder in Count I.

[3]      Logan was sentenced to an indeterminate term of 15 years to life imprisonment.

ammunition, and a camouflage vest recovered from the apartment where McAlister stayed on the night of the murder, and d) a 911 call; 3) the trial court erred in excluding evidence Schweiss had cocaine in his system when he died; and 4) the trial court erred by instructing the jury that it need not unanimously agree as to which theory of murder applied in this case.  The California Court of Appeal unanimously affirmed the judgment against McAlister in a reasoned, unpublished opinion issued on May 22, 2017.  *Logan*, 2017 WL 2224351, at *28.[4]  The California Supreme Court denied McAlister's petition for review without comment on August 16, 2017.

McAlister then timely filed a *pro se* Petition for a Writ of Habeas Corpus in this Court on July 9, 2018.  Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1),(2).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, McAlister argues, as he did before the California Court of Appeal on direct appeal, that: 1) his first-degree murder conviction is unsupported by substantial evidence of premeditation; 2) the trial court erred in admitting certain of Logan's statements implicating McAlister in the shooting; 3) the court erred in instructing jurors that unanimity was not required for the theory of murder; and 4) the prosecutor committed misconduct by "arguing false testimony in a misleading fashion."

---

[4]     The appellate court also unanimously affirmed the conviction of judgment against Logan.  *Logan*, 2017 WL 2224351, at *28.

6

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).  The term unreasonable is a common term in the legal world.  The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law.  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

7

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"
*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

McAlister has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also*

*Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true.  *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

**Ground 1.**      *Insufficiency of the Evidence*

McAlister first argues that his first-degree murder conviction should be reversed because there was insufficient evidence presented at trial to support that he acted with premeditation and deliberation.  As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This Court must therefore determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).  Consequently, although the sufficiency of the evidence review by this Court is grounded in the

Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id.* at 3-4. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Under California law, "[m]urder is the unlawful killing of a human being, . . . with malice aforethought." CAL. PENAL CODE § 187(a).  First degree murder includes murder perpetrated by "any . . . kind of willful, deliberate, and premeditated killing[.]" CAL. PENAL CODE § 189. "'[D]eliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." *People v. Wright*, 703 P.2d 1106, 1114 (1985) (quoting with approval pattern jury instructions).  "The word 'premeditated' means considered beforehand." *Id.*  "A cold, calculated judgment and decision may be arrived at in a short period of time," but "[t]o constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill." *Id.*

The type of evidence which courts have found sufficient to sustain a finding of premeditation and deliberation fall into three basic categories: (1) facts about how and what the defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing (i.e., planning activities); (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a motive to kill the victim; and (3) facts about the manner of the killing from which the jury could infer a preconceived design to take the victim's life.  *People v. Anderson*, 447 P.2d 942, 949 (Cal. 1968).  These three categories of evidence are not an exhaustive list, but "provide guidelines" for analysis.  *People v. Perez*, 831 P.2d 1159, 1163 (Cal. 1992); *see also Davis v. Woodford*, 384 F.3d 628, 640 & n.3 (9th Cir. 2004) (applying *Anderson* guidelines on federal habeas review but noting admonition of California Supreme Court that *Anderson* did not define elements of first degree murder or definitively state

11

prerequisites for proving premeditation and deliberation in every case, but rather was intended only as a framework to aid in appellate review) (citation and quotations omitted).

In support of his claim, McAlister argues that the manner of killing was ambiguous because the evidence supported a finding that his "response was on the spur of the moment" and "not thought over in advance," and the evidence "did not show careful weight of considerations in forming a course of action."[5]  Docket No. 1 at 7.  But this argument simply avers that the jury should have viewed the evidence differently; all of the evidence he identifies in support of his claim was before the jury for its assessment.  This Court is precluded from re-weighing the evidence.  *Schlup*, 513 U.S at 330.  Moreover, as the California courts have frequently held, premeditation does not require an extended period of time.  *People v. Thompson*, 231 P.3d 289 (Cal. 2010); *People v. Koontz*, 46 P.3d 335 (Cal. 2002).  "The test is not time, but reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly."  *Thompson*, 231 P.3d at 321 (citation omitted).  As the Court of Appeal reasonably concluded:

> Beginning with planning, while it was Stewart who called Schweiss, and Tewksbury who told him to drive into the parking lot, the record supports a reasonable inference it was McAlister who wanted him there.  Tewksbury was simply arranging what she believed to be a marijuana sale.  And between Stewart and McAlister, it was the latter who asked where Schweiss was parked, while Stewart sat by himself next to the laundry room.  Luring Schweiss into that parking lot, rather than meeting him across the street where McAlister had already conducted a drug sale earlier in the night, evidenced a plan to rob him of his marijuana, at the very least.  Bringing a loaded firearm evidenced a preconceived design to kill should it be necessary to effectuate the robbery.  Turning to

---

[5]     It is also worth noting, as did the Court of Appeal, that the prosecution primarily relied on a felony-murder theory of first-degree murder, and McAlister did not challenge the sufficiency of the evidence to support his conviction under that theory.  *Logan*, 2017 WL 2224351, at *5.  Accordingly, even if there were insufficient evidence of premeditation and deliberation, "a valid ground for the verdict remains."  *Id.*

motive, . . . McAlister possessed a motive "to effectuate [the] robbery . . . by killing the victim-witness."

Finally, the manner of killing also indicated premeditation and deliberation. As McAlister himself admitted in Ford's apartment, he "turned around and was like pop, pop," using his hand to imitate firing a gun.  The presence of a live round at the murder scene, in addition to the expended cartridge, also provided evidence both that the gun was loaded when McAlister pulled it on Schweiss and he manually racked the slide in order to ensure there was a round in the chamber.  This is because, as the firearms expert testified, racking the slide with a live round already in the chamber ejects that live round and pulls a new round into the chamber from the magazine.  After that round is fired, the gun automatically ejects the expended cartridge and pulls another round into the chamber. McAlister's act of manually ensuring the gun was loaded, followed by an admittedly nonchalant firing of two shots at the victim, one of which struck him in the abdomen, provided evidence McAlister made a cold and calculated decision to kill.

We conclude the evidence is sufficient to support McAlister's first degree murder conviction.

*Logan*, 2017 WL 2224351, at *6-7 (citations omitted).

Although it might have been possible to draw a different inference from the totality of the evidence, this Court is required to resolve that conflict in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  Thus, considering the deference owed under *Jackson*, *Cavazos*, and the AEDPA, this Court concludes that there was sufficient evidence of premeditation and deliberation introduced at trial from which a rational trier of fact could have found beyond a reasonable doubt that McAlister was guilty of the first-degree murder of Schweiss.  McAlister is therefore not entitled to relief on his insufficiency of the evidence claim.

**Ground 2.** *Evidentiary Errors*

McAlister next argues, as he did on direct appeal, that the trial court erred in admitting: 1) statements Logan made during a police interview in violation of McAlister's right to confront witnesses; and 2) statements Logan made to Ford immediately after the event.  The Supreme Court has made clear that federal habeas power does not allow a court to grant relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the

13

admissibility of evidence.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  In this context, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights.  *Estelle*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).  Indeed, the Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."  *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).  In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution."  *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

"The admission [or omission] of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process."  *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67).  Where a due process violation is alleged stemming from an evidentiary challenge, federal courts review such alleged due process violations for whether admission or omission of certain evidence "so infected the entire trial that the resulting conviction violates due process."  *Estelle*, 502 U.S. at 72.  A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision."  *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005).

1.    *Logan's statements to law enforcement*

McAlister claims that the trial court erred in admitting into evidence certain of Logan's

statements to law enforcement implicating McAlister in the murder, which McAlister contends

violated his rights under *Aranda/Bruton*;[6]  In considering this claim on direct appeal, the Court

of Appeal laid out the following factual background to this claim:

> During Logan's police interview, after initially claiming he was inside Ford's
> apartment when the shooting occurred, Logan admitted he was in the parking lot and saw
> Schweiss "get shot."  When the detective conducting the interview asked what happened,
> Logan said: "Other people wanted free weed, I guess, 'cause they didn't wanna pay for
> it."  Logan also nodded in agreement when the detective said: "So somebody that was
> with you there, wanted - didn't wanna pay for it, so they were tryin' to rob the guy of the
> weed?  Obviously somebody had a gun. Is that what happened?  They tried to rob him for
> the weed?  They pulled a gun out and said give me your weed?"  Logan then said two
> men went into Schweiss's van to take the marijuana and denied being one of them.  He
> never specifically implicated McAlister as a participant in the robbery.
>     This interview was admitted into evidence during the prosecution's case in
> rebuttal, after both Logan and McAlister put on their defense cases.  McAlister testified
> during his defense case, providing an account of the murder that implicated a man he
> referred to as "Little Bro."  According to McAlister, after he and Logan went across the
> street to make a cocaine sale and returned to the back of the complex in Dunn's car, Little
> Bro approached him and asked whether he had any more "powder" because a friend had
> sent someone over to the complex to make a purchase.  McAlister said he did and walked
> over to the parking lot with Little Bro, a girl who was giving somebody directions over
> the phone, and "some other guy."  Schweiss then pulled into the parking lot, got out of
> his van, and asked McAlister, "do you got it[?]"  McAlister said he did and walked over
> to the van with Schweiss and Little Bro. On the way, Little Bro said Schweiss owed him
> money.  When they got to the van, Schweiss and McAlister got inside to negotiate the
> sale while Little Bro, still outside the van, started "bickering" with Schweiss about being
> owed money.  Schweiss and McAlister then got out of the van.  As McAlister described:
> "Little Bro he kept arguing talking about you trying to buy some powder and you ain't

---

[6]    *See People v. Aranda*, 407 P.2d 265 (Cal. 1965) (finding that admission of
confession implicating co-defendant in joint trial resulted in miscarriage of justice
notwithstanding instruction that confession was admissible only against confessing defendant);
*see also Bruton v. United States*, 391 U.S. 123 (1968) (finding that admission of confession
implicating co-defendant in joint trial constituted prejudicial error even under circumstances in
which trial court gave clear jury instruction that confession could only be used against
confessing defendant and must be disregarded with respect to co-defendant).

pay me my money and Little Bro punched him." As Schweiss tried to get away, Little Bro pulled out a gun. McAlister said, "whoa, hold on," and told Schweiss to leave. Schweiss got in the van, but then "jumped right back out," at which point McAlister was "trying to like keep Little Bro away from him." Schweiss again got in the van and again got back out. This was when McAlister heard gunshots and ran back to apartment 26. McAlister neither confirmed nor denied Logan's presence in the parking lot during these events and said he lost track of Logan's movements after they returned to the complex in Dunn's car.

McAlister objected to the admission of Logan's police statement to rebut his trial testimony, arguing its admission would violate his right of confrontation under the Sixth Amendment to the United States Constitution. The trial court overruled the objection, agreeing with the prosecutor's argument Logan never implicated McAlister during the interview.

*Logan*, 2017 WL 2224351, at *10.

The Confrontation Clause of the Sixth Amendment mandates that a criminal defendant has the right to confront and cross-examine the witnesses against him. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987). This generally means that out-of-court testimonial statements by a witness are not admissible against a defendant unless the witness is available for cross-examination at trial or the defendant had an opportunity to cross-examine the witness about the statements before trial. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). This rule applies with equal force to statements by a non-testifying accomplice or co-participant. *See Bruton*, 391 U.S. at 135-36 (holding that the admission of a statement of an accomplice or co-participant that implicates a defendant violates the defendant's Sixth Amendment rights when the defendant has no opportunity to cross-examine the co-participant).

Where, however, the accomplice's statement does not directly implicate the defendant—i.e., the statement is "not incriminating on its face, and [becomes] so only when linked with other evidence introduced later at trial"—the Constitution does not prohibit the introduction of the statement. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987); *see also Mason*

16

*v. Yarborough*, 447 F.3d 693, 695 (9th Cir. 2006) (noting that *Bruton* "specifically exempts a statement, not incriminating on its face, that implicates defendant only in connection to other admitted evidence").

Here, the Court of Appeal found that Logan's police interview statements were not incriminating on their face because the statements implicated unnamed people and it was "McAlister's own testimony, and other evidence presented during the trial, [that] provided the inferential link connecting Logan's nonidentifying statements to the conclusion McAlister was actually the 'somebody' to whom Logan was referring." *Logan*, 2017 WL 2224351, at \*12.  The appellate court nonetheless concluded that *Richardson* was distinguishable because no limiting instruction had been given to the jury not to consider the police interview statements as evidence of McAlister's guilt.

Respondent argues that, because the Ninth Circuit has not required a limiting instruction be given for the *Richardson* rule to apply, *see Mason*, 447 F.3d at 695, McAlister's *Bruton* claim would not succeed on direct review, and thus the grant of habeas relief is precluded, *see Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).  But in any event, a *Bruton* claim, like other Confrontation Clause claims, is subject to harmless error analysis.  *Lilly v. Virginia*, 527 U.S. 116, 139-40 (1999); *Harrington v. California*, 395 U.S. 250, 254 (1969).  The Court of Appeal rejected McAlister's *Bruton* claim on this ground, concluding that even if a *Bruton* error had occurred, such error was harmless.  It reasoned:

> Here, direct evidence overwhelmingly placed McAlister at the scene of the murder, including his own testimony admitting he was there.  There was also strong evidence, aside from Logan's police statements, that the murder occurred during the commission of a robbery.  As we have already described, Burnett testified that during the confrontation she witnessed while pulling into the parking lot, Schweiss was saying: "Help.  Somebody help.  I don't have anything.  I gave you everything.  Leave me alone.

17

Help.  Help."  These pleas make little sense unless the confrontation she witnessed was a robbery in progress. And while Logan's police statements do not specifically identify McAlister as the man who demanded marijuana from Schweiss and then shot him, McAlister's own statements establish his identity as that person.  While joking about the shooting in Ford's apartment, McAlister said he got "two zips of weed" and then "turned around and was like pop, pop," using his hand to imitate firing a gun.  McAlister also told Jordan, "I downed him," as McAlister retreated from the direction of the parking lot to Ford's apartment immediately following the shooting.  Thus, McAlister's own statements were far more powerfully incriminating than Logan's inferentially incriminating statements.  Moreover, as we describe below, Logan's statements to Ford, *i.e.*, McAlister "just killed that man for no reason" and "just shot him for no reason," were properly admitted.  These statements corroborated McAlister's statements in Ford's apartment and to Jordan on his way into that apartment.  Finally, as more fully detailed during our discussion of the sufficiency of the evidence, circumstantial evidence also strongly established McAlister's identity as the shooter, including evidence he was armed with a handgun immediately before and after the shooting, Schweiss was shot with an uncommon caliber of ammunition, a box of such ammunition was found hidden in apartment 26, where McAlister stayed the night of the murder, this type of ammunition was fired by a limited number of Eastern Bloc handguns, and despite Jordan's familiarity with firearms, he had never seen a gun like the one he saw in McAlister's possession after the shooting.

In light of all of this evidence, we conclude the admission of Logan's police statements was harmless beyond a reasonable doubt.

*Logan*, 2017 WL 2224351, at *13.

Applying the *Brecht* standard here, this Court must agree.  As the Court of Appeal noted, there was not only substantial, but in fact overwhelming evidence that established McAlister's guilt of the offenses charged.  Based on the evidence adduced at trial, it is inconceivable that the jury would or could have reached a different verdict as to McAlister in the absence of Logan's statements.  It therefore cannot be said that the admission of the statements had a substantial or injurious effect or influence on the jury's verdict, and McAlister is not entitled to relief on this ground.

18

2.    *Logan's statements to Ford*

McAlister similarly challenges the admission of Ford's statement to law enforcement in which she said that Logan told her: "I'm gonna kill [McAlister] because he just killed that man for no reason," and "[McAlister] turned around and just shot him for no reason."  Because the Confrontation Clause applies only to testimonial statements, McAlister acknowledges that Logan's statements are not testimonial and thus do not implicate McAlister's right to confrontation.  *See Delgadillo v. Woodford*, 527 F.3d 919, 927 (9th Cir. 2008) (finding that "the state court's implicit conclusion that [the victim's] remarks to her coworkers did not implicate [the petitioner's] Sixth Amendment rights of confrontation" was not contrary to, nor an unreasonable application of, *Crawford*).

Nonetheless, McAlister argues that the statements were improperly admitted under the hearsay exception for declarations against penal interest, California Evidence Code § 1250.  But such claim is not cognizable on federal habeas review.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997) ("We accept a state court's interpretation of state law, . . . and alleged errors in the application of state law are not cognizable in federal habeas corpus.").  Whether a statement constitutes hearsay is a question of state law that this court may not revisit.  *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *cf. Lilly v. Virginia*, 527 U.S. 116, 125 (1999) (plurality opinion) (whether statements qualified as statements against penal interest for purposes of state hearsay rule is a "matter of state law").  Accordingly, McAlister is not entitled to relief on this claim either.

**Ground 3.** *Instructional Error – Unanimity Instruction*

McAlister additionally contends that the trial court erred by instructing the jurors that they need not agree on the theory of murder even though they needed to agree on the degree of murder.  Because jury instructions in state trials are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380 (1990).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471 U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

20

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id*. Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson*, 431 U.S. at 155. In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72. Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519 U.S. 2, 5 (1996).

The California Court of Appeal rejected McAlister's instructional error claim on direct appeal, rejecting any contention that the jurors could have disregarded the unanimity requirement when determining the degree of the murder. *Logan*, 2017 WL 2224351, at *25. McAlister fares no better on federal habeas review. Even assuming that McAlister had a federal constitutional right to the unanimity instructions at issue here, *Ramos v. Louisiana*, 140 S. Ct.

1390, 1397 (2020) (overruling nearly 50 years of Supreme Court authority to hold that the Sixth

Amendment right to jury trial requires a unanimous verdict to convict a defendant of a serious

offense in state court as well as federal court), McAlister has not proven that the unanimity

instruction given here violated due process or that it resulted in prejudicial error.  The Court of

Appeal considered and rejected this claim on direct appeal as follows:

>    The jury was instructed, pursuant to CALCRIM No. 521, defendants were each
> charged with first degree murder under two theories, *i.e.*, (1) premeditated murder and
> (2) felony murder.  The instruction continued: "You may not find any defendant guilty of
> first degree murder unless all of you agree that the People have proved that the defendant
> committed murder.  *But all of you do not need to agree on the same theory*."  (Italics
> added.)  This was an accurate statement of the law, and defendants do not claim
> otherwise.  As our Supreme Court has repeatedly explained: "Premeditated murder and
> felony murder are not distinct crimes; rather, they are alternative theories of liability, and
> jurors need not unanimously agree on a particular theory of liability in order to reach a
> unanimous verdict."  (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 479; *People v.
> Benavides* (2005) 35 Cal.4th 69, 101.)
>    After this instruction was given, the jury was further instructed with former
> CALCRIM No. 548 (Aug. 2014 Supp.) that informed the jury: "The defendants have
> been prosecuted for murder under two theories: (1) malice aforethought, and (2) felony
> murder. [¶] Each theory of murder has different elements, and I have instructed you on
> both. [¶] You may not find a defendant guilty of murder unless you all agree that the
> People have proved that the defendant committed murder under at least one of these
> theories.  *You do not all need to agree on the same theory*."  (Italics added.)  The jury
> was not instructed with a bracketed portion of CALCRIM No. 548 (added in the February
> 2016 edition of the instruction) that would have added, "but you must unanimously agree
> whether the murder is in the first or second degree." (CALCRIM No. 548, Feb. 2016 ed.)
> We first note this bracketed portion was not included in the instruction at the time of
> trial. However, as defendants correctly observe, the jury was required to unanimously
> agree as to the degree of murder and should have been so instructed.
>    Nevertheless, we conclude the jury would have understood this to be a
> requirement from the instruction that followed immediately thereafter, CALCRIM No.
> 640, regarding their deliberations and completion of the verdict forms when first degree
> murder is charged and verdict forms for second degree murder are also provided.
> Pursuant to this instruction, the jury was instructed: "You may consider these different
> kinds of homicide in whatever order you wish, but I can accept a verdict of guilty or not
> guilty of second degree murder only if all of you have found a defendant not guilty of
> first degree murder.  [¶]  As with all of the charges in this case, to return a verdict of
> guilty or not guilty on a count, you must all agree on that decision."  The instruction then
> more specifically informed the jury regarding how to fill out the verdict forms.  We

conclude the jury would have understood from this instruction that it was required to unanimously agree as to the degree of murder.  "'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.]  'We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions. [Citations.]' [Citation.]  "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citations.]' [Citation.]"  (*People v. Sanchez* (2013) 221 Cal.App.4th 1012, 1024.)

Here, based on all the instructions, the jury would have known to determine with respect to each defendant whether that defendant committed murder (either malice murder or felony murder), and if they unanimously agreed defendant committed murder (without a unanimity requirement as to the theory), they would then determine whether the murder was first degree murder (either premeditated murder or felony murder), and if they unanimously agreed the murder was of the first degree (again without a unanimity requirement as to the theory), they would not reach second degree murder, and only if they unanimously agreed the defendant was not guilty of first degree murder would they reach second degree murder and be required to unanimously agree as to whether the defendant was guilty of that lesser crime.  This is all the unanimity that was required.

Nevertheless, defendants argue this case involves more than multiple theories supporting liability for murder, relying on cases holding unanimity is required where there are multiple criminal acts that could have constituted the charged offense.  (*See People v. Dellinger* (1984) 163 Cal. App. 3d 284, 300–302 [dispute over which act or acts caused the victim's death]; *People v. Madden* (1981) 116 Cal. App. 3d 212, 215–219 [several sexual acts could have constituted the charged sexual offense].)  These cases are inapposite.  Here, there is no dispute over how Schweiss was murdered.  He was shot in the abdomen.  Nor were there several discrete criminal acts that could have constituted the charged murder.  There was only one.  The dispute in this case was over who pulled the trigger, whether the murder occurred during the commission of a robbery, and whether the defendant who did not pull the trigger nevertheless aided and abetted in the commission of that robbery or in the murder that resulted therefrom.

As our Supreme Court explained in *People v. Jenkins* (2000) 22 Cal.4th 900: "'It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by [the] statute, it need not decide unanimously by which theory he [or she] is guilty.  [Citations.]  More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator. . . .  [¶] . . . [¶]  Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt.  Sometimes, . . . the jury simply cannot decide beyond a reasonable doubt exactly who did what.  There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he [or she] was the aider and abettor, but no such doubt that he [or she] was one or the other.'  [Citations.]  Defendant contends that different facts would support aiding and abetting

23

liability and liability as a direct perpetrator, but, as we have explained, the jury need not unanimously agree 'on the precise factual details of how a killing under one or the other theory occurred in order to convict defendant of first degree murder.' [Citation.] Naturally, in order to return a guilty verdict, the jury must agree unanimously that each element of the charged crime has been proved, but the factors that establish aiding and abetting liability are not included as elements of the crime of murder. [Citation.]" (*Id.* at pp. 1024–1025.)  The same reasoning applies here.

Nor are we persuaded by defendants' reliance on *People v. Sanchez*, *supra*, 221 Cal.App.4th 1012, a case in which the different theories of liability for murder supported "different degrees of murder" and the trial court provided the jury with a response to a jury question that "undermined the notion of unanimity as to degree." (*Id.* at p. 1025.) As the court explained: "There is no way to determine, on the record presented, whether the jury followed the instruction during deliberations stating unanimity was not required, or the earlier instruction pursuant to CALCRIM No. 640, which set forth a different approach to the verdict forms on both degrees of murder." (*Ibid.*) Here, both theories of liability relied on by the prosecution at trial supported first degree murder.  Nor did the trial court undermine CALCRIM No. 640 during the jury's deliberations, but instead highlighted the need for unanimity as to degree by referring the jury to this instruction in response to jury questions regarding whether they could find either defendant guilty of second degree murder even if they could not agree as to first degree murder.

We conclude the challenged instruction was properly given.

*Logan*, 2017 WL 2224351, at *24-26.

The Court of Appeal's determination is both reasonable and fully supported by the record.  Accordingly, McAlister cannot establish a due process violation on his claim that the unanimity instruction was insufficient, and he is not entitled to relief on this ground.

**Ground 4.**     *Prosecutorial Misconduct*

Finally, McAlister claims that the prosecutor committed misconduct during summation by quoting witness Robert Jordan's testimony that McAlister told him after the murder that McAlister had "downed" the victim.  According to McAlister, Jordan's testimony was false because, in an earlier interview with police, Jordan had claimed that McAlister made the statement to his brother.

"[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted).  The essential elements of such successful claim are that (1) the testimony is false or perjured, (2) the prosecutor knew that the testimony was false or perjured, and (3) the false testimony was material.  *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc); *see Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001).  Thus, if McAlister successfully shows that the prosecutor knowingly elicited perjured testimony material to his case, habeas relief may be warranted.

Although a prosecutor has a duty to refrain from knowingly presenting perjured testimony, *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002), the record does not support McAlister's unsupported contention that the prosecution knowingly introduced the Jordan's perjured testimony.  While McAlister points to inconsistencies in Jordan's testimony and pre-trial statements, mere inconsistencies in witness testimony are insufficient to establish that the prosecution knowingly introduced false testimony, as it is "within the province of the jury to resolve the disputed testimony."  *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002); *see also United States v. Zuno–Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995).  As the Court of Appeal explained in rejecting McAlister's claim on direct appeal:

> The prosecutor simply repeated to the jury what Jordan said under oath on the witness stand.  While McAlister could have impeached this testimony with a prior inconsistent statement made to the investigator, the jury was entitled to credit Jordan's testimony, and the prosecutor was entitled to remind the jury what that testimony was during her closing argument.  Unlike the cases cited by McAlister in his briefing on appeal (*e.g.*, *United States v. Blueford* (9th Cir. 2002) 312 F.3d 962, 968 ["improper for

25

the government to propound inferences that it knows to be false, or has very strong reason to doubt"]; *In re Sakarias* (2005) 35 Cal.4th 140, 155–156 ["fundamental fairness did not permit the People, without a good faith justification, to attribute to two defendants, in separate trials, a criminal act only one defendant could have committed"] ), the fact Jordan may have made a prior statement that was inconsistent with his trial testimony did not mean the prosecutor either knew or had strong reason to believe his trial testimony was false.

*Logan*, 2017 WL 2224351, at *27.

Upon independent review of the challenged comments, the Court must conclude that the Court of Appeal's rejection of McAlister's claim was neither contrary to, or an unreasonable application of, clearly-established federal law.  Accordingly, McAlister is not entitled to relief on his prosecutorial misconduct claim.

V. CONCLUSION AND ORDER

McAlister is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: April 21, 2021.

              /s/James K. Singleton, Jr.
              JAMES K. SINGLETON, JR.
              Senior United States District Judge